Case Numbers 20-1118 USA v. Donald Gardner 20-1170 USA v. Martellanis Nix 20-1260 USA v. Ryan Brown 20-1265 USA v. Douglas Carey III 20-1266 USA v. Marvin Nix and 20-1272 USA v. Selina Kalaric All arguments not to exceed 15 minutes per side. Ms. Mary Chartier-Mittendorf for the appellants. I used to start with a little enthusiasm this morning. Good morning, your honors. May it please the court. My name is Mary Chartier and I represent Douglas Carey and I am arguing on behalf of the other attorneys as only one lawyer was designated for this case. With the court's permission, I would like to request five minutes for rebuttal. Thank you, your honor. The government will always be able to claim that listening to private phone calls is necessary in a case. The government will always be able to say there are more individuals we want to learn information about, there's more evidence that we want to gather. But that's not the standard for a wiretap. The standard, as this court is well aware, is necessity. And in this case, the government did not meet the necessity requirement. Do you agree that necessity doesn't seem to mean what we would normally think of as necessity in terms of absolutely no other way or nothing? In other words, it's more of a McCullough v. Maryland necessary than it is maybe common parlance necessary? Correct. Because the government doesn't have to show that it 100% absolutely can only get this information by a wiretap. It has to show that essentially investigative techniques either are unlikely or reasonably unlikely to get them the information that they are seeking or they tried and they failed. But in this case, the government had a comprehensive investigation where they were able to gather significant amounts of evidence. Not only did they have confidential sources, including one who was active at the time the wiretap went live. So this individual was with the leader of the drug trafficking organization on a regular basis and was engaging in drug transactions on a regular basis, which is rare. They also had an undercover police officer who had been engaging in direct sales with the leader of the drug trafficking organization. They knew the source and they had information about him from Texas. They knew stash houses. They knew a great deal of information. The government will claim that they wanted more, but the government always wants more. They always want to know who else was involved. Isn't it the case in these kind of large drug conspiracies that, I mean, their point is the conventional sources are only going to take us so far. We need to dig deeper and we want to root out, not yes, we could arrest two people right now or three people, but we want to get everybody. And if we execute a search warrant or we do something, we're going to tip everybody off. This is the only way. I don't know, and we've permitted it in other cases, so I don't know why it wouldn't have been permitted here. It has been permitted in other cases, but this court needs to draw a line because the arguments that this honor or your honor just said, the arguments that the government has made and will make are applicable in every case. The government will always want to get more people. That is generic to every single drug trafficking case out there, and they never do. They never get the very top person because that person is usually in another country. They never get all the customers. I think that's a little bit unfair here, isn't it? I mean, they specifically said, look, we tried trash poles. We tried physical surveillance. Here are the limits of the confidential informant. I mean, the affidavits, yes, there's some boilerplate that I would expect to see in every drug conspiracy, but there were some fairly specific things to this case and why they had kind of run the course. So I guess I'm still not sure why that isn't enough here. Because that level of specificity can be used in every case. Boilerplate doesn't just mean physical surveillance won't work or a trash pole won't work and then end it right there. The government almost always incorporates why it won't work. Trash pole won't work for a specific reason or physical surveillance as they did in this case. But those rationales are applicable to every single case. It would be fair to say that a number of the arguments that are being made by you and your co-counsel are that they move too fast. They jumped into the wiretaps too early. Yet when we look at this, they've been investigating over 12 months and they've tried a lot of different things. So can you give us some examples of what more you think they should have been doing, either with your client or with any of the other clients for that matter, before they prematurely sought a wiretap in your view? They could have continued on with some of the same mechanisms that they were using. They had an active confidential source who was involved with Mr. Mayfield. But if I can stop you right there, wouldn't that, to take the other side of the argument, be also true in every single one of these cases? They always could continue to do more of what they're doing. They could, Your Honor. But in this situation and in many situations, excuse me, in this situation in contrast with many situations, they had a confidential source embedded in the drug trafficking organization. If we go back to why wiretaps were originally enacted and allowed in this country, it's these close-knit either organized crime situations or close-knit gang situations where it is incredibly difficult to embed somebody in that organization. Here, they had somebody embedded in the organization. They also had an undercover police officer. Now, the government will say that Mr. Mayfield stopped dealing with this individual. But he did have Mr. Mayfield engaged in numerous drug transactions. Also, the government could have indicted the numerous people that they had more than enough evidence on already. And they could do what they do in a lot of these cases, start proffering individuals because those people will be looking for a reduction in their sentence, which is exactly what happened in this case. Other than law enforcement and other government witnesses, at trial, the government's case was made up entirely of individuals who had been caught by the government. Mr. Gentry on down. This is routine. This is what the government does. They indict and then turn people. And then they either use that for the individuals on the indictment who are not pleading or they supersede and add more people on. The government does not have to take the extremely... I mean, I hear you. You're making sense. But again, back to Judge McKee's question, that would be true in every case. I mean, if the main way they make their case is they get informants or they turn co-defendants against each other, that would always be the strategy. And a wiretap would never be necessary then. I guess I'm trying to figure out where your line is on what would it have been? Where could they have gone? Like, is it just a case where I don't have an informant? And by the way, would we have to dig into whether they looked hard enough to get an informant or exhausted their ability to get an informant before they could get a wiretap? I'm just not sure where your line is. Potentially. Wiretaps are supposed to be rare. They're supposed to be hard to get. It's not supposed to be a situation where the government says, we tried this routine mechanism of physical surveillance or cooperating sources, and it's not working. And, yes, if the government is saying that we can't get an informant, I think that a district court judge would want to know, well, what did you do to try to get an informant? Not to be the case out of the Eastern District, where they really couldn't get an informant, and they detailed why they couldn't get somebody embedded in. Now, they did have collateral individuals. They had people kind of on the outside, but not somebody on the inside. There are going to be rare instances where wiretaps are needed. But when we look at this, this is a routine drug case. There's nothing secretive about this organization. They were able to surveil them back and forth from Texas and beyond. They had GPS trackers. They had phone toll analysis. They had all of these mechanisms that they were using. The only thing that they come into court and say is, we want more. And then, is that necessary? Can I ask just, it says other methods have been tried or failed in the statute. So I think your argument there is that it had been successful, so nothing had failed. But the government's response is, yeah, we got some information, but we still didn't have a lot of knowledge about the cohorts of some of the main actors. So what, in your view, actually indicates failure? Because the government's always going to, as you said, they're going to say, we want more. And objectively, they were failing in some sense, but you're saying they were successful in some sense. So I'm curious what failure means in the statute. I don't think the government was failing. I think the government was extremely successful. They detail instance after instance where they have Mr. Mayfield, Mr. Gentry, and others. And they have them really with no wiggle room for those individuals, which is why they ended up pleading guilty. Where they would fail is, for example, if Mr. Mayfield didn't want to meet the undercover officer, they just couldn't get a law enforcement officer in pretending to be a drug user or a drug distributor. If they could not turn a cooperating source, if their physical surveillance, they had none of it, or very little. For example, they might have surveilled Mr. Mayfield from point A to point B, but they had no context of what was going on. Here they had a great deal of context. How is that tied to, how is that, these are all like fact-bound arguments about what failure means, but how is that tied to the statute? Is it just tied to the generic understanding that wiretaps should be rare? It is, because in most of these cases, and this court well knows this, the wiretaps are, people challenge the wiretap issue, and then this court and other appellate courts say the wiretap is fine. Rice is a unique situation in this circuit where you had material omissions where a court believed that that was a reckless, but you did also have another facet of Rice where the court said that there was not enough specificity. It was generic as to the reasons why investigative techniques would not work. Out of the Ninth Circuit, you have three cases, Gonzalez, Bowman, and Kalustyan, where the court indicates that the methods that the government is claiming here that didn't work were generic. It is applicable in every case, and I see my time is up. I have two questions, if I might, before you sit down. One is just the timing here. If you were making this argument because they sought the wiretap permission after 90 days or something like that, all of what you're saying would resonate a lot more, but at least my understanding is they were doing seven or eight different techniques for about a year before they resorted to wiretaps. Is that correct? That is correct, Your Honor. So do you have a case where they've been doing this many things for this long to still say there wasn't necessity? No. Again, the universe of cases where courts have said that the necessity requirement was not met is really small, as this panel certainly knows, and I'm sure your clerks know as well. So we would be making law in terms of the parameters that you would like to see set for these questions? Not making law as much as putting some more meat on the bone, so to speak, because it's not about 90 days or nine months or nine years. It's about what is the government doing. Okay. The counterpart of that question, to go to your point about they could have continued to do what they're doing. They do this 12 months. They do these seven or eight different things. You've got three different affidavits. I'm curious what your reaction to the fact that the two Nicks brothers, cousins, whatever they are, are not mentioned in the first two affidavits. Excuse me, they're not mentioned in any affidavit. They don't actually come forward, as far as the police are concerned, until after they get the wiretaps. So doesn't that at least indirectly corroborate this idea that they needed the wiretaps to get all the peripheral players? Respectfully, no, because that's always going to happen. If nobody else was caught on the wiretaps, then so be it, right? The government would say, well, we tried and we failed. If we look closely at the government, when they were seeking the wiretap, they said they wanted to get top-tier individuals. And then they also said they wanted to get other individuals as well. They didn't get any top-tier individuals beyond what they had, which was Mr. Mayfield and Mr. Gentry. That doesn't mean, for example, that they didn't try. But what it means is when they get on the wiretap, they don't know exactly who they're going to pick up. Are they going to pick up a low-level customer or dealer? Are they going to pick up the top guy? But the fact that they got more people doesn't mean the necessity requirement was met. It doesn't mean that they were right. It just means that they were fortunate or lucky and that that person was on the phone. Thank you. Thank you, Your Honors. Thank you. Leon, are we not doing the lights on the podium or we're just doing the clock? Okay. Good morning. Excuse me. Good morning, and may it please the Court. My name is Dan McGraw. I'm an assistant U.S. attorney from Grand Rapids, Michigan. I represent the United States in this case. The wiretap applications in this case were supported by probable cause and demonstrated the requisite necessity. Defendants are not disputing that there was probable cause, and the issuing judge in this case, Chief Judge Yonker, did not err or abuse his discretion in finding that each application was supported by the adequate necessity. So accordingly, this Court should affirm the judgment of the District Court. As this Court knows, necessity is not a key. A fine-drawing case, as you can tell from what we've been talking about so far. So where would you draw the line? Ms. Chartier wants to draw the line about, geez, you've got to keep doing what you're doing longer, and it's not enough just to say you want to get some small fish. So aside from just saying the line should be drawn exactly where you did it here, how would you have us answer that question if we chose to address it? I think the preference for everyone would be more of a black and white determination, that there could be some line drawn in the sand, but that's not what the statutory language requires, and it's not what this Court's case law has held. In the Landmesser from 1977, this Court interpreted the necessity requirement in the statute. All the government's required to do is simply inform the District Court of the difficulties that have been involved in the use of conventional techniques, and those that have succeeded. It's informing the District Court of the investigation to date. And then as you'll read in the statute, similar to making a probable cause determination for a search warrant, reasonable minds can differ as to the necessity standard. And so the issuing judge who is there reading the affidavit that's presented to him is in the best position to make those factual determinations, may be likely to succeed or fail, too dangerous. These are judgment calls that the issuing judge has to make. So I don't think, Your Honor, as much as I'd like to be able to draw a fine line in the sand as to, you know, six months is enough or 12 months is enough, I think the issuing judge has to look at the totality of the affidavit, which is what this Court's case law has held as well, to determine if it complies with the necessity statute. And that's not an exhaustion requirement. I know the defendants would like it to be. But the affidavits in this case proved that, yes, we had used confidential sources. One of those confidential sources was buying directly from Howard Mayfield, the lead target in this case. But he was a customer. I respectfully disagree with Ms. Chartier's characterization of that confidential source. He wasn't embedded in the drug trafficking organization as someone who was a close associate of Mr. Mayfield, buying ounces and ounces of cocaine at a time for further distribution. He was more of a street-level user and dealer. That was the CS who introduced the undercover to Mr. Mayfield. And as Ms. Chartier noted, Mr. Mayfield stopped dealing with him for some reason. That was one of the roadblocks that was noted in the first application, that the undercover was trying to continue to do controlled buys for Mr. Mayfield, but he stopped returning his calls. So I would just point the court to the fact that the standard is not an exhaustion requirement. Are there any statistics or is there any information on how often wiretaps are used? Is that data kept somewhere? I'm curious about how rare it is. I mean, how would this drug conspiracy, was it unusual? It doesn't seem to be unusual to me. I mean, it's not a small one, but it's not, I don't think, unusual. Is that right? Not unusual in the sense that the DEA identified a local target and was able to identify that they were getting controlled substances from out of district. So in that sense, I don't think it was unique. It was unique in the fact that based on the confidential source information, it was a lot of cocaine that Mr. Mayfield, for our district, was moving on a regular basis. And that was corroborated by the GPS trackers that were put on Mr. Mayfield's car, showing the trips that he was making or his associates were making to West Memphis or all the way to Houston. So I think, and initially I would note for the court, certainly Mr. Gentry was identified through confidential source information and then corroborated through physical surveillance and GPS trackers. But the first application in this case identified, I believe, ten targets, right? And two of those targets were Mr. Mayfield and Mr. Gentry. Maybe investigators at that point had enough evidence to charge those two. I wouldn't say that they had enough evidence to charge, or that we had enough evidence to charge all ten of those targets at that point. They were just identified as associates of Mr. Mayfield and involved in this drug trafficking organization. Just thinking of the statute at a high level of generality, I agree with you that the language seems quite discretionary. But the clear indication or clear signal from the statute is that wiretaps should be rare. They should happen in rare instances. And I wonder if you could just summarize in a quick few sentences why this case stood out as one of the rare ones in which a wiretap was appropriate. Sure. It is fact specific and it's discretionary to the issuing judge. And I think this case, it stood out to investigators because of the information they were getting from confidential sources that Mr. Mayfield was moving a lot of cocaine for our judicial district. And it was coming from a great distance away, from Houston, which is a border, lack of a better term, where controlled substances come in through other countries. So the fact that it touched another state, there was interstate drug trafficking, and then they had identified initially at least a few targets in Grand Rapids who were known to law enforcement based on their prior criminal histories as being significant drug traffickers. So the fact that there's a lot of interstate movement of drugs, is that an often signal for why you need wiretaps? Just because you don't know where the people are located in the other states? I wouldn't say it's a signal, but it would certainly play into the necessity finding. And I think, again, when we're looking at the necessity finding, we have to look at what was tried in this case, what succeeded, what failed. And certainly we can see Mr. Mayfield making those trips down to Houston. We can even ask DEA agents in Houston to watch those meetings, but we don't know what they're talking about. We don't know how much drugs he's buying, what he's transporting back to Michigan. There's a lot that we don't know. And so, yes, that information, of course, is valuable to the investigation and we're able to get that information if we're able to listen to their phone calls. I had the earlier question, I'm curious. Is there any data on how often you apply, how often it gets granted or denied? I'm sorry, Your Honor, I didn't mean to ignore that question. I don't have that data at my fingertips right now. There may be that data available somewhere within the department, and if Your Honor would like, I could follow up with a supplemental filing if I'm able to find that information. Yeah, that would be great. It seems to me that there is something to your friend on the other side's argument about how this looks like it could be done. If this is enough, there's always going to be some question about how there are others, or even peripheral players, as Judge McKee pointed out, that the wiretaps will get you that extra information, but maybe you could have worked harder. So I'm just kind of trying to figure out that. Sure. And even if the government has achieved some of its goals, let's say right before the first application we've identified Mr. Mayfield, we've identified his supplier in Houston, nothing requires the government to call off its investigation after it achieves some of its goals. That's this Court's holding in Stewart, a 2002 case. So the goal here was to not only identify other suppliers, and I would note for the record, after the third wire was up, we identified another supplier of Mr. Mayfield's. We didn't just go downstream. He stopped dealing with Mr. Gentry. Their relationship had a falling out after the last kilo of a five-kilo deal was bad quality. We were able to find a supplier in Detroit, two individuals in Detroit actually. One bounced back and forth between Detroit and Muskegon, and he started supplying Mr. Mayfield with kilos of cocaine at a time. So I don't think it's accurate to say, you know, we got the wire. We already knew who the big players were, and then we just went downstream locally to local ounce-level dealers in Grand Rapids. We identified another kilo source out of Detroit and Muskegon. So I just wanted to note that for the record. And you mentioned Stewart. So I assume you're relying upon Stewart to argue that we're looking for an abuse of discretion here. And I think that's a great question, Your Honor, because this, yes, I do think there is discretion owed to the issuing judge in this case, Chief Judge Jonker. And when looking at this court's case law regarding that standard, there has been some variation to it, whether it's great deference, abuse of discretion, or even clear error. I think, sure, Stewart stands for abuse of discretion. Corrado, citing Alfano, will accord great deference to the determinations of the issuing judge. The majority, it seems, from this circuit rely on abuse of discretion. And that would be. What's the difference between great deference and abuse of discretion? They seem similar to me, Your Honor, and I think there are smarter legal minds out there than I to opine on that. I'm not entirely sure. Can I ask just about the process? So it's discretion in the issuing judge. I assume it's the four corners of the application that we look to. Just, you know, with probable cause, if you have an affidavit and an issuing magistrate issues a warrant, we're supposed to stick to the four corners of the warrant as to whether there's probable cause. I assume that same standard applies, stick to the four corners of the application about whether the necessity requirement is met? That's correct, Your Honor. But then I thought your point about all the additional information that was discovered with the wiretaps was, yeah, okay, that's powerful. We can't really consider that when we're considering whether the application was sufficient. No, I think that's a good point. The applications in this case build on one another, so I don't think Chief Judge Yonker is required to view them in a vacuum. He also views them as a whole, right? So he's not just looking at the necessity section. He's keeping in mind the entire application, that he's read the entire affidavit when he's reviewing these. But the analogy to looking at the fact that you found these other suppliers would be suggesting that, oh, yeah, of course there was probable cause for a search warrant for a home because there was drugs in the home. It was a successful warrant, so that means there was probable cause. So we're not supposed to... Chicken and the egg scenario, I understand. Is it really true that we look only at the four corners when an officer presents an affidavit to the issuing judge or magistrate and there's oftentimes colloquy there, they discuss it, and the magistrate is entitled to take into account anything additional that the officer tells him, isn't he? I would believe so, Your Honor. That's not in the record in this case. Did that happen here or was this just something they sent it in and Yonker looked at it and sent it back? So to be clear for the record, I was not the AUSA who was involved in the swearing out of these applications, so I wasn't personally there. My understanding of the process from personal involvement in other cases is that the AUSA and the affiant, in this case DEA, TFO, Joseph Young, show up in Judge Yonker's chambers and swear out the affidavit in person with him. At that point, Judge Yonker could ask questions if he had any additional clarification that he needed. But to Judge Murphy's point, you're not relying on something else that the issuing judge was told in a meeting like that? We're not, and there's nothing of that in the record. Judge Maloney, certainly as the reviewing judge, didn't rely on anything other than what was in the affidavits in this case. So, Your Honors, I do believe there is some deference owed to Judge Yonker here. If we could just go back to some of the other arguments that the defendants and the appellants make in this case, there was mention of, well, this could be done in every drug case. Wires could be sought in every drug case. First, the government doesn't have the resources to do wiretaps in every drug case, but this Court has also held that just because some of the language that may seem boilerplate or likely in all drug investigations doesn't mean that it's not necessary for a wiretap in this case, and that was the Wren case. It's true because drug cases are alike, right? You have reluctant witnesses who don't want to come forward and provide information on sometimes dangerous and violent drug dealers. Executing search warrants prematurely can blow the covert nature of the investigation and maybe not end up in this discovery or seizure of any significant evidence. Those typical traditional investigative techniques that were tried in this case were unlikely to succeed. It is of no – this Court has already recognized that just because that can be true for another drug case doesn't mean that it doesn't meet the necessity standard in this case. We can't say they were unlikely to succeed. They did succeed. Some of them did. Did they succeed enough? They succeeded enough to the point to get us where we needed another investigatory method, and that investigatory method was a wiretap so that we could discover the true breadth of this case. I would note, again – So if you stop right there, what Ms. Chartier says is, well, every case you can do all these techniques, and there is a point of time when you could argue that a wiretap was always necessary to get any peripheral players. So how do you address that? I would go back to the statutory language for necessity, Your Honor, and just point out that I think it was the Young case where this Court recognized it's not – it doesn't have to be the extraordinary case, right? It doesn't have to – all that needs to be done is the government needs to try traditional investigative techniques, show the issuing judge whether those techniques succeeded or failed, and why they couldn't try other investigative techniques in the investigation, whether it was too dangerous or whether they were likely to fail. That is what the statute requires, nothing more and nothing less. And so for all those reasons, Your Honors, we would ask that this Court affirm the judgment of the District Court. Thank you. Thank you, Counsel. Lotto? Your Honor, may we also look for the data on wiretap and file a supplemental pleading? I know the government said they were going to try and do that as well. Yeah, I know. Okay, thank you. The government's argument that the interstate movement of drugs makes this a rare case or it makes this case applicable for a wiretap guts the notion of the standard in the law. Because the interstate movement of drugs happens in every cocaine case. Cocaine is not being grown and processed here in Michigan. It's almost always coming across the border. So in cocaine cases, a wiretap then would always be allowed. And in almost every other case, unless it's Michigan-grown marijuana, drugs are coming in from out of state. That's not a rarity in a federal drug case or in a state drug case. That's commonplace. The true breadth of the case, as this Court indicated by you, Judge McKeague, it would be required or it would be part of every single drug case. I mean, I cannot state that enough. There is nothing unique or rare about the players in this case or the situation. But Congress didn't put in all the qualifying language that you would like to see in the statute. Congress just said that they had to present the necessity for doing this. And they don't define necessity. So having said that, they did all of these different things over a long period of time. Just from a logical, practical standpoint, why isn't that enough? Well, this Court has indicated in Williger that we need to protect the privacy of phone communications and text message communications. Not that texts were common in the 90s, but they certainly are now. It doesn't protect those communications when the government is allowed to come in and just say we tried these generic techniques that are applicable in every investigation and they failed. And to this Court's question, in this case... Your friend on the other side is right. I mean, there isn't going to be that much variation. It's trash pulls, physical surveillance. You can say they're generic, but they are what they are. That's what you do in a drug case. So I assume you're agreeing that, yes, there's going to be some overlap, right? Definitely. So if we can imagine, for example, let's say there are ten common techniques in every drug case. Trying to get a confidential source, trying to get physical surveillance, trash pulls, those sorts of things.  What is going to be different is how successful these techniques have been and how unlikely they are to be successful if they haven't been tried. Here, many of them were extremely successful. The physical surveillance, the confidential source. And confidential source one, the government stated in the affidavit, was an integral part of the investigation. So I know Mr. McGraw is trying to indicate that this wasn't someone embedded. He had known and worked with Mr. Mayfield for years. They had an undercover law enforcement officer. They had more than enough to indict a large number of people. So if we look at these common techniques and then we look at what did the government do, because that's what's going to be significant. What did they do in this individual case that makes it either they failed or they would be reasonably likely to fail? That's where the reviewing court has to take a look at what the court who signed the affidavit or signed the warrant looked at. The interesting part about that argument is that in a number of the briefs, and I don't remember if it was yours particular, say it's all generalities in these affidavits. But when we read the necessity section of these three affidavits, which are pretty extensive, there is case-specific information that addresses exactly the question that you're raising. It just doesn't say we tried a trash pull that didn't work. It then goes on to explain why the additional things that they would traditionally do they don't anticipate would work. It seemed rational anyway in reading it. Those problems exist in every drug case. People who are committing crimes don't want to get caught. Individuals who are dealing drugs don't want to deal with someone who has not been vouched for by someone else. That happens in every case. It's difficult to do a trash pull. That's applicable in every case. Although if you work with the sanitation department, they pick up the trash and then the police go through it later on. But they didn't try that in this case. But every single problem that they have, they could plug that into every single wiretap affidavit for every drug case and then just change the names. All they have to do is change the names and change the dates. Mr. Mayfield doesn't like dealing with new people. Well, he likes it enough that he dealt with their undercover officer. But all drug people, they don't want to meet someone new. They want to try and keep things secretive. That is common in every single case. What they don't have here is that rare, unique instance where people are so closed off that they don't want to deal with a stranger. So where do you get a case that sets the standard for rare and unique? I just don't find that in these cases. Well, the fact that a wiretap is supposed to be rare. Actually, the word rare doesn't seem to appear very often. If we look at cases from this court, for example, if we go back to Rice, where they indicated that the necessity requirement was not met. Granted, there are two parts to Rice. By talking about generic information in the affidavit. Generic information isn't saved by putting in some specificity, by putting in some dates or some names. It's not saved by adding in detail. The court has to look at the entire affidavit and say, when they indicate that physical surveillance will not be successful, what has been the success that they've had with physical surveillance so far? And it had been great. They had fantastic success with physical surveillance. Same with, again, cooperating sources. They had three of them in this case. So to say that they wanted more, they can say that in every single case. There just has to be a reigning in of the government. Otherwise, they can listen to our calls no matter the scenario because they will always be able to say, we want more people, we want more evidence. This is a case where the government did not meet its burden, and we ask that this court reverse and suppress the wiretap. Thank you, Counsel. Thank you. The case will be submitted, and thank you for arguing this issue on behalf of everyone. Thank you, Your Honor. We appreciate that. Clerk may call the next case.